1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHARLES EDWARD LEE,

11            Petitioner,                    No. CIV S-08-1710 MCE CHS P

12        vs.

13   M. KRAMER,

14            Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                         I.  INTRODUCTION

17            Petitioner Lee is a state prisoner proceeding pro se with an amended petition for

18   writ of habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner is currently serving a sentence of

19   30 years to life following his 2006 second degree murder conviction in the Sacramento County

20   Superior Court.  In the pending petition, petitioner presents various claims challenging the

21   constitutionality of that conviction.  Based on a thorough review of the record and applicable

22   law, it is recommended that the petition be denied.

23                         II.  BACKGROUND

24            On direct appeal, the California Court of Appeal, Third District, summarized the

25   evidence admitted at petitioner's trial.  Petitioner is the defendant referred to therein:

26   /////

In late 2003, Crystal Wells, a 40-year-old woman with a drug problem and a history of theft, lived in a home owned by her mother Dorothy Shaver on Clay Street in Sacramento. Shaver rented the house to women who have had problems with drugs. Jacqueline Avery was the only other tenant of the Clay Street house to be home on Christmas night 2003.

In the early morning hours of December 26, 2003, Avery was awakened by the sound of a table tipping over. She heard Wells say in a loud voice, "Get the fuck out of here." Avery got up and went to see what was going on. When she got to the door to the kitchen, Avery saw Wells standing near the open back door looking outside. Wells said somebody had broken into the house and that she had been stabbed. Wells asked Avery to call her mom, who lived next door, and to tell her she had been stabbed. Wells went upstairs to her bedroom.

Avery called Shaver, but did not tell her that Wells had been stabbed. When Shaver came over four to seven minutes later, she and Avery went upstairs where they found Wells collapsed on her stomach on the floor. Shaver called 911 and, at the operator's direction, started CPR. The police and an ambulance arrived, but it was too late; Wells was dead.

An autopsy of Wells showed she had an inch-long knife wound on her upper right arm, a two-inch-long knife wound at the base of her neck, and a stab wound to her left chest. The first two wounds were superficial and not life-threatening, but the stab wound to her chest penetrated her heart, causing her death. The angle of the wound was from front to back, approximately 20 degrees from right to left, and approximately 10 degrees downward from horizontal. A person with such a wound to the heart could talk, stand, and walk for some brief period of time before becoming unconscious. Wells also had small abrasions on her forehead and left thigh. Wells's blood-alcohol level measured 0.13 percent and she had methamphetamine, cocaine, and cocaine metabolite in her system when she died.

Police found evidence of a struggle in the house, including a large area rug askew and a telephone stand knocked over. A button with some threads attached to it was found on top of the rug. In Wells's bedroom upstairs, police found two used narcotics smoking pipes. A piece of foil with residue and soot was found under the edge of a chaise, a baggie containing methamphetamine was found behind the back of the chaise, and on top of a storage chest was a cell phone. Defendant's name was displayed on the face of the phone. The police looked at the call list on the phone, which led them to look for a woman named Denise Hysaw and eventually led them to an address on Huron Street.

/////

Police arrived at the Huron Street address around 8:15 p.m. that evening. When police told Charles Fields, who answered the door, that they were looking for Hysaw and defendant, Fields directed them upstairs to where defendant was sleeping. After waking defendant, police asked him to come downtown to make a statement. In the subsequent interview with police, defendant denied being at Wells's house the previous night or any other time. Defendant claimed he did not know what the police were talking about when they asked him for his story of what happened at the Clay Street house. He denied knowing Wells or anyone living at the house. When police pointed out defendant's shirt was missing a button, defendant said it had been missing for years. At trial, a criminalist testified the button found at the crime scene likely came from defendant's shirt.

As police were leaving the Huron Street address, Hysaw walked up. She was taken in and questioned. Hysaw testified at trial that she called defendant's cell phone on the night of December 25/26. Defendant said he was about two blocks away and they agreed to meet. However, defendant did not appear when Hysaw walked in the direction she expected to meet him. Hysaw walked to the house on Huron Street where she was invited by Fields to come inside and wait. Fifteen to 20 minutes later, Hysaw saw defendant walking up to the house. When he came in the door, Hysaw saw he had a small knife in his hands. There appeared to be a little blood on the tip of the knife. Defendant went into the kitchen to wash his hands and the knife. Hysaw asked defendant several times if he had any methamphetamine without any response from defendant. Eventually, defendant said, "No, I don't have any shit [drugs]. It's gone. She took it." Later defendant added he stabbed or "shanked" her. Defendant said, "I can't believe that bitch took my shit. She took it. I can't believe that."

When Hysaw asked defendant what had happened, defendant explained that on the way to meet Hysaw, a woman (Wells) came up to his car. Defendant decided to sell the woman the drugs he was going to share with Hysaw. The woman said she needed to go to her house to get the money, so defendant drove her back to her house. Defendant and the woman went inside and upstairs as defendant had agreed to let the woman try the drugs. The woman got her paraphernalia and smoked some of the drugs. When defendant glanced over, however, all the drugs were gone. He asked the woman if she wanted to go ahead and buy the drugs, but she said, "No, it's time for you to go." Defendant told her he would be glad to go as soon as he got either his drugs or the money. The woman repeated, "No, it's time for you to go." She stood up and walked to the door. Defendant looked for his stuff, but when he did not see it, he told the woman he wanted his stuff. The woman pushed and/or tugged him, telling him, "You gotta go. You gotta go." Defendant demanded his stuff before he would go. Then they

3

began to tussle. Defendant told Hysaw he stabbed the woman once in the neck and once in the chest. (Hysaw told police the night she was questioned that defendant said he stabbed or cut the woman three times.) According to Hysaw, after this conversation defendant noticed his cell phone was missing. He thought he left it in his car, but Hysaw checked the car and it was not there.

A few hours later, Hysaw saw a news report of the incident indicating the victim was dead. She told defendant of the report. A couple of hours later, defendant and Hysaw left the Huron Street house to look for drugs. At one point, they visited defendant's brother, Floyd Lee. Hysaw heard defendant ask Lee whether Lee had heard about the stabbing. Defendant told his brother he was involved. When his brother asked what happened, defendant told him he was letting her try the drugs and the next thing he knew, the drugs were gone. Defendant told his brother he still had the knife. Lee told defendant to get rid of it. Hysaw did not actually see the knife being turned over, but it sounded like the knife was thrown out. Defendant and Hysaw left, found some drugs and went back to the house on Huron Street where they did the drugs, had sex and took a nap. Defendant was still asleep when Hysaw woke up and left for the store. When she returned, she saw police cars in front of the house and officers were bringing defendant out in handcuffs.

Defendant's brother (Lee) testified defendant and a woman came over to his home on the morning of December 26, 2003. Defendant looked tired and said it had been a bad night. Defendant handed Lee a little knife and asked Lee to keep it for him. Lee put it in a coat pocket. Lee denied wrapping it in a towel before putting it in the pocket. Lee testified defendant never said he hurt anybody. Police later contacted Lee, who led them to the knife, which the police found wrapped in a towel and placed inside a pocket of a jacket inside a closet. According to the forensic pathologist, the knife seized by the police could have inflicted Wells's injuries.

Criminalist Michael Toms testified defendant's urine sample at the time of his arrest showed amphetamine, methamphetamine and cocaine metabolite. Wells's autopsy blood sample showed methamphetamine, cocaine and cocaine metabolite. The effects of a single dose of methamphetamine or cocaine in the first four hours included mild euphoria, excitation, exhilaration, increased strength, increased alertness, rapid speech, decreased appetite, motor restlessness, and overall poor impulse control. In the last four to 24 hours, as the person was coming down, the person would experience nervousness, anxiety, paranoia, possibly agitation and aggression, an intense craving for more drugs, and ultimately extreme fatigue. If a person took more than a single dose, the effects could be amplified.

Defendant testified on his own behalf.  He testified he drove to Del Paso Heights around 2:30 a.m. on December 26 looking for a

4

prostitute.  He had in his possession one-sixteenth of methamphetamine and a $20 piece of cocaine.  Defendant saw three women standing near the corner of Grand and Clay.  He recognized two of them as prostitutes.  He pulled over and parked.  The woman he did not know, who turned out to be Wells, came over to his car.  They discussed the possibility of a date.  Wells got into defendant's car, and they agreed to a price of $20.  Defendant drove to the Huron Street house, but it was occupied, so they went to Wells's house.  On the way Wells asked defendant if he had any drugs.

When they arrived at the Clay Street house, Wells seemed fidgety and told defendant to hurry up. She collected a smoking pipe from a BBQ pit and they went inside the house and upstairs to her bedroom. Wells asked if they could smoke some of the dope before they had sex and defendant agreed. They smoked defendant's cocaine and shared some of the methamphetamine. Defendant stripped to his underwear and Wells took off her pants. She began dancing around in her underwear. Defendant asked to use the bathroom and Wells directed him downstairs.

Defendant went down the stairs, but it was dark, so he turned around and went back upstairs to ask Wells to show him where the bathroom was located. When defendant reentered the bedroom, Wells had her back to him. She had defendant's pants and was going through the pockets. Defendant startled her when he asked her what she was doing. She turned around and her whole demeanor changed. She appeared to be mad at defendant for some reason. Wells threw defendant his pants and told him to get dressed and get out. Defendant said okay and started putting his clothes back on. Wells went downstairs.

As defendant followed after Wells, he checked his jacket pocket for the drugs, money and cell phone that had been in the pocket earlier. It was all gone. At the bottom of the stairs, defendant saw Wells standing at the open back door. She had her right hand behind her back. Defendant asked where his belongings were. Wells told him to just go ahead and leave. Under the impression she was hiding his belongings behind her back, defendant reached for Wells's right arm with his left arm. Wells suddenly drew back and defendant saw she had a knife in her hand. Wells lunged at defendant, who being scared and panicked, immediately grabbed her wrist to keep from being stabbed. They struggled over the knife. With her left hand, Wells repeatedly hit defendant on the top of his head. She was hollering and cussing, telling him to "get the fuck out." Wells forced defendant backwards. Defendant tripped over something, slipped and fell on his back. Defendant still had a hold of Wells's arm and as he fell, defendant pulled Wells down on top of him and the knife. Defendant kept twisting Wells's wrist to get the knife out of her hand. When he succeeded, he rolled over and pushed Wells off of him. He jumped up and ran out of the

house. He had no idea Wells was hurt. He looked back when he reached his car and saw Wells at the door. He heard her cussing and saying, "I called the fucking police." If he had known she was hurt, defendant testified he would have tried to get medical assistance.

When he returned to Huron Street, defendant claimed he told Hysaw and Fields that he had an altercation with a female at her house, she had pulled a knife on defendant, they struggled and defendant took the knife from her. Prior to leaving Fields's house, defendant heard news of a break-in or something in the same area in which he had been. Defendant went out to the car and got the knife. He noticed a little blood and told Fields, "Man, you know, the lady, she must have got cut or something." He put the knife in his pocket.

Later, when defendant was at his brother's home, his brother asked defendant if it was possible that the news was about the same incident defendant had been involved in. Defendant said no. Lee asked defendant to take Hysaw home and then come back to discuss it. As defendant was leaving, defendant handed the knife to Lee to hold onto until defendant got back. Defendant drove back to Fields's house. He was so tired that he laid down and fell asleep. He remained asleep until an officer shook his foot to wake him up.

Defendant admitted two felony convictions, for a theft in 1998 and for passing bad checks in 2001. He admitted lying to the police when he was questioned that night. According to defendant, he did not want to discuss the matter and it was his way of ending the conversation.

On rebuttal, Shaver testified her daughter was left-handed. The parties stipulated a doctor had tested Wells's grip strength during a medical examination in 2002, which also indicated she was left-handed.

(*People v. Lee*, 2007 WL 2358709 at 1-5 (Cal.App. 3 Dist. 2007).

A jury found petitioner guilty of second degree murder, and further found true an allegation that he used a knife as a deadly weapon in committing the offense.  The trial court found that petitioner had a prior felony conviction for assault with a deadly weapon that qualified for enhancement purposes as a serious felony (*see* Cal. Penal Code §667(a)), and as a prior "strike" (*see* Cal. Penal Code §667(b)-(i)).  Petitioner was sentenced to an indeterminate term of 30 years to life, plus an additional determinate term of six years.

/////

## III.  ISSUES FOR REVIEW

Petitioner claims, though not in this order, that (A) the trial court erred in violation of his right to due process and a fair trial when it ruled that the defense's proffered expert testimony was character evidence about the victim that would open the door to evidence of petitioner's character for violence; (B) the court made an instructional error; (C) the prosecutor committed prejudicial misconduct during closing argument; (D) the trial court's responses to the jury's questions about heat of passion were deficient or misleading; (E) trial counsel rendered ineffective assistance; and (F) the cumulative effect of these errors deprived petitioner or a fair trial.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Additionally, this petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied

7

1  to a particular claim by the state courts was contrary to the law set forth in the cases of the United

2  States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

3  *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

4                                            V.  DISCUSSION

5                  A.      Evidentiary Ruling on Dr. Globus's Expert Testimony

6                  Pursuant to the California Code of Evidence, character evidence is generally

7  inadmissible to prove a person acted in conformity with it on a given occasion.  Cal. Evidence

8  Code §1101(a).  Section 1103 sets forth exceptions to this general rule.  One exception allows a

9  criminal defendant to offer evidence of the victim's character to show the victim acted in

10  conformity.  Cal. Evidence Code §1103(a)(1).  If the defendant offers evidence showing the

11  victim "had a character for violence or a trait of character tending to show violence," then the

12  prosecution may offer evidence of the defendant's violent character to show the defendant acted

13  in conformity.  Cal. Evidence Code §1103(b).

14                  At trial, Wells's mother Shaver testified that her daughter was "bipolar kinda.

15  They were trying to test her for certain things."  (Reporter's Transcript ("RT") at 103.)   Shaver

16  explained that Wells was made aware she had "a possibility of bipolar" disorder about three or

17  four months before her death.  (RT at 109.)  Another family member testified that Wells took

18  medication for bipolar disorder.  The prosecutor and petitioner's attorney both indicated to the

19  court this was the first time they had heard such evidence.

20                  Defense counsel obtained Wells's medical records and had them reviewed by Dr.

21  Albert Globus.  Counsel indicated to the court he wanted Dr. Globus to testify about the effects

22  of cocaine and methamphetamine on a person with bipolar disorder.  Specifically, counsel

23  expected Dr. Globus to testify that Wells's bipolar disorder, combined with her use of cocaine

24  and methamphetamine, could lead to her becoming aggressive.  (*See* Clerk's Transcript ("CT") at

25  147-148.)  This testimony would support the defense theory of the case that petitioner acted in

26  self-defense in reasonable fear of Wells.

                                                    8

1    The prosecutor did not dispute the admissibility of Dr. Globus' testimony, but

2 argued that Dr. Globus's testimony would "open the door" to evidence of petitioner's character

3 for violence pursuant to section 1103 of the California Evidence Code.  (RT at 582.)  Petitioner

4 had previously incurred two prior violent convictions including one involving a firearm.

5    The trial court ruled Dr. Globis's proffered testimony admissible and relevant to

6 petitioner's theory of self-defense.  The court further ruled that Dr. Globus's proffered testimony

7 was character evidence under state law that put the victim's character at issue.  Consequently, if

8 Dr. Globus gave the testimony, the prosecution would be allowed to impeach petitioner with the

9 two prior convictions for acts of violence.  Ultimately, the defense did not offer Dr. Globus's

10 testimony.

11    On direct appeal, petitioner claimed that the trial court's ruling was an abuse of

12 discretion and also that it violated his right to due process and right to present a defense.  The

13 California Court of Appeal, Third District, disagreed with petitioner's argument that Dr.

14 Globus's proposed testimony was only offered to show Wells's state of mind at the time of the

15 crime and thus was not character evidence within the meaning of section 1103 of the California

16 Evidence Code.  Rather, the state court found,

17         [i]t is clear from defendant's offer of proof and arguments that
           defendant intended to use Globus's testimony to show Wells had a
18         mental condition or personality traits that caused her to have a
           propensity or a disposition to act irritably, irrationally, and
19         aggressively and, therefore, she was likely to have acted in
           accordance with such disposition or traits in her actions towards
20         defendant that night after smoking drugs with him. Indeed,
           defendant argued such testimony would be used to support his
21         assertion that he reasonably feared for his life and or safety.
           Defendant's proposed use of Globus's testimony supported
22         defendant's claim of self-defense because it was directed at
           Wells's character for violence, that is, her actions reasonably
23         caused defendant to fear for his life. If Wells's actions did not
           include any suggestion of violence, they would not have been
24         relevant to support defendant's claim of his reasonable fear of
           Wells. Defendant did not propose to limit his use of the testimony
25         to show Wells's state of mind; he wanted the evidence admitted in
           order to support his perception, that is, his state of mind of
26         reasonable fear.

9

(*People v. Lee*, 2007 WL 2358709 at 7 (internal quotations omitted).)  Thus, the state appellate court concluded that the trial court had correctly ruled that introduction of evidence regarding Wells's character for aggression or violence would open the door for the prosecution to admit evidence of defendant's character for violence.

The state appellate court's rejection of petitioner's claim is not contrary to, or an unreasonable application of clearly established Supreme Court precedent.  Because a violation of state law does not ordinarily provide a basis for habeas relief (*Estelle*, 502 U.S. at 67-68), the state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it rendered the state proceedings so fundamentally unfair as to violate due process.  *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000), *cert. denied*, 532 U.S. 984 (2001).

Criminal defendants have a due process right, implicit in the Sixth Amendment, to present a defense.  *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  That right is not unlimited.  *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002).  A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane*, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense").  To be unconstitutional, an evidentiary exclusion must have "significantly undermined fundamental elements of the accused's defense."  *Scheffer*, 523 U.S. at 315.  In other words, in order to prevail, petitioner must show that the state court's ruling was so prejudicial that it rendered his trial fundamentally unfair.  *See Estelle*, 502 U.S. at 68.

In addition, even if a trial court's exclusion of evidence amounted to a constitutional violation, habeas corpus relief is warranted only if the constitutional violation actually had a "substantial and injurious effect" upon the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121-122 (2007) (requiring *Brecht*

1   review regardless of whether the state court recognized the error and reviewed it for

2   harmlessness).

3          State lawmakers have broad latitude under the Constitution to establish

4   evidentiary rules for criminal trials.  *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  In

5   this case, the trial court concluded that Dr. Grobus's proffered testimony was character evidence

6   that would open the door under state law to evidence of petitioner's character for violence.  This

7   determination is binding on this court for purposes of this review.  *See Bradshaw v. Richey*, 546

8   U.S. 74, 76 (2005) ("state court's interpretation of state law, including one announced on direct

9   appeal of the challenged conviction, binds a federal court sitting in habeas corpus")

10         The trial court's ruling did not implicate petitioner's right to present a complete

11  defense because it did not prevent the defense from presenting Dr. Grobus's testimony.  In light

12  of the ruling, the defense made a tactical decision not to present Wells's character evidence.

13  Nevertheless, no defense evidence was excluded by the court.  Petitioner fails to identify any

14  clearly established Supreme Court precedent, and a thorough search reveals none, holding that

15  due process is offended by application of an evidentiary rule such as the one at issue here.

16  Petitioner's trial was not rendered fundamentally unfair simply because he had to make a

17  strategic choice between presenting Dr. Globus's testimony and keeping out evidence of his own

18  character for violence, including the fact that he had incurred prior violent non-felony

19  convictions.

20         Moreover, the jury heard evidence regarding Wells's drug problem, and heard

21  evidence that she had bipolar disorder.  The jury heard evidence that both petitioner and Wells

22  abused drugs, and evidence that Wells had alcohol, cocaine, and methamphetamine in her body

23  when she died.  An expert had testified that methamphetamine and cocaine are central nervous

24  system stimulants that can give people increased strength and aggressiveness as well as cause

25  paranoia.  Petitioner testified that Wells's demeanor changed after they smoked drugs together.

26  Based on this evidence, counsel argued in detail and at length that Wells was the aggressor and

1  petitioner acted in self-defense.  Counsel argued specifically that Wells's bipolar disorder,

2  combined with her drug use that day, caused the situation to escalate to a struggle for the knife.

3  Thus, the jury had the opportunity to evaluate the defense theory of the case.  *Cf. Conde v. Henry*,

4  198 F.3d 734, 741 (9th Cir. 1999) (trial court violated petitioner's right to due process where it

5  improperly precluded defendant's attorney from making closing argument explaining the

6  defendant's theory of the case, refused to instruct the jury on the defendant's theory and, over the

7  defendant's objection, gave erroneous instructions that did not require that the jury find every

8  element of the offense).

9       Moreover the trial court's evidentiary ruling did not have "substantial and

10  injurious effect or influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 637.  To

11  warrant relief, an alleged error must have resulted in "actual prejudice."  *Id*.  Here, because

12  petitioner was still able to present his self-defense theory of the case, the trial court's evidentiary

13  ruling did not have substantial and injurious effect or influence in determining the jury's verdict.

14  For all these reasons, the decision of the state appellate court was not contrary to, or an

15  unreasonable application of clearly established federal law, nor based on an unreasonable

16  determination of the facts in light of the evidence.

17       B.    Instructional Error

18       Petitioner claims that the trial court made an instructional error with respect to the

19  law on involuntary manslaughter.[1]

20

---

21       [1] In the pending federal petition, petitioner makes a single allegation of instructional error regarding the trial court's involuntary manslaughter instruction.  On direct appeal, petitioner also

22  asserted that the trial court erred in failing to instruct, sua sponte, with the second paragraph of CALJIC No. 5.54 (2004 Re-revision).  But petitioner failed to raise this issue in his federal

23  petition, instead addressing it for the first time in his reply brief.  Thus, this court need not address the allegation.  *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005) (habeas corpus issue

24  presented to the district for the first time in a reply brief is waived).

25       Petitioner did allege in his federal petition that trial counsel rendered ineffective assistance in failing to request instruction with the second paragraph of CALJIC No. 5.54.  This

26  allegation is discussed *infra*, in subsection E(1)(c).

1    At petitioner's trial, the jury was instructed with CALJIC No. 8.45 as follows:

2    Every person who unlawfully kills a human being, without malice
     aforethought, and without an intent to kill, and without conscious
3    disregard for human life, is guilty of the crime of involuntary
     manslaughter, in violation of Penal Code Section 192(b).
4
     There is no malice aforethought if the killing occurred in the actual
5    but unreasonable belief in the necessity to defend one's self against
     imminent peril to life or great bodily injury.
6
     A killing in conscious disregard for human life occurs when a
7    killing results from an intentional act, the natural consequences of
     which are dangerous to life, which act was deliberately performed
8    by a person who knows that his conduct endangers the life of
     another and who acts with conscious disregard for human life.
9
     *A killing is unlawful within the meaning of this instruction if it
10   occurred:*

11   *One, during the commission of an unlawful act not amounting to a
     felony which is dangerous to human life under the circumstances
12   of its commission;*

13   *Or [two,] in the commission of an act, ordinarily lawful, which
     involves a high degree of risk of death or great bodily harm,
14   without due caution and circumspection.*

15   A violation of Penal Code Section 417, brandishing a weapon, is
     an "unlawful act" not amounting to a felony
16
     The commission of an unlawful act, without due caution and
17   circumspection, would necessarily be an act that was dangerous to
     human life and its commission.
18
     In order to prove this crime, each of the following elements must
19   be proved:

20   One, a human being was killed;

21   And two, the killing was unlawful.

22   (RT at 860-61 (italics added).)

23         With respect to the above instruction, petitioner contends that the jurors might

24   have misunderstood it as precluding conviction of involuntary manslaughter if they believed

25   petitioner was committing a felony when the killing occurred.  In particular, petitioner complains

26   that the italicized portion of the instruction highlights that a killing which occurs during

                                          13

1  commission of a misdemeanor or act of criminal negligence is an "unlawful killing" within the

2  meaning of the definition, but does not likewise specify circumstances under which a killing that

3  occurs during commission of a felony is an "unlawful killing."

4          On direct appeal, the state appellate court rejected petitioner's claim of error:

5          The jury was instructed with CALJIC No. 8.45, the first part of
        which informed the jurors of the general principle that "Every
6          person who unlawfully kills a human being, without malice
        aforethought, and without an intent to kill, and without conscious
7          disregard for human life, is guilty of the crime of involuntary
        manslaughter."  This provided the jurors with a legally correct
8          definition of involuntary manslaughter that they could apply in
        reaching their verdict.  (*People v. Lee, supra,* 20 Cal.4th at pp. 61-
9          62.)  In encompassed defendant's claimed defense that he
        unintentionally killed Wells under the circumstances required for a
10         conviction for involuntary manslaughter.

11         Although the last part of CALJIC No. 8.45... as given, highlight[s]
        the misdemeanor and criminal negligence forms of involuntary
12         manslaughter, the instructions did not imply there were no other
        methods to prove involuntary manslaughter.  In this sense, the
13         misdemeanor manslaughter instruction was merely "illustrative" of
        and not "restrictive" on the general theory of involuntary
14         manslaughter.  (*See People v. Lee, supra,* 20 Cal.4th at p. 62.)
        Nothing in the court's instructions suggested or even implied that
15         this form of involuntary manslaughter was exclusive.  (*Ibid*.)

16  (*People v. Lee,* 2007 WL 2358709 at 16.)   This state court decision is not contrary to, or an

17  unreasonable application of clearly established federal law, nor based on an unreasonable

18  determination of the facts in light of the evidence.

19          First, a claim of instructional error is cognizable on federal habeas corpus only if

20  it "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502

21  U.S. at 72; *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Nauhten*, 414 U.S.

22  141, 146-47 (1973).  "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction

23  rises to the level of a due process violation."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  It

24  is not enough to show that the instruction was "undesirable, erroneous, or even universally

25  condemned," but rather, it must have actually rendered the trial fundamentally unfair.  *Estelle*,

26  502 U.S. at 72.  The challenged instruction or instructions "may not be judged in artificial

1   isolation, but must be considered in the context of the instructions as a whole and the trial

2   record." *Id.* If the instructions, when considered in this manner, are found to be ambiguous, then

3   a due process violation results only if there is a reasonable likelihood that the jury misapplied the

4   challenged instruction in a manner that violates the Constitution. *Id.* (citing *Boyde v. California*,

5   494 U.S. 370, 380 (1990)); *see also Middleton*, 541 U.S. at 437.

6          Second, the instruction in question is a lesser included offense instruction. There

7   is no clearly established Supreme Court authority requiring lesser included offense instructions in

8   non-capital cases. In *Beck v. Alabama*, the Supreme Court held that a defendant in a capital

9   murder case has a constitutional right to have the jury instructed on a lesser included offense in

10  certain circumstances, but expressly reserved judgment on "whether the Due Process Clause

11  would require the giving of such instructions in a non-capital case." 447 U.S. 625, 638 at n.14

12  (1980); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993). In the years following *Beck*, the

13  circuits split on the issue whether due process requires lesser included offense instructions in

14  certain instances for non-capital defendants. *See Solis v. Garcia*, 219 F.3d 922 (9th Cir. 2000)

15  (citing collected cases).

16         The Ninth Circuit has held that "failure of a state court to instruct on a lesser

17  included offense [in a non-capital case] fails to present a constitutional question and will not be

18  considered in a federal habeas corpus proceeding." *See Bashor v. Risley*, 730 F.2d 1228, 1240

19  (9th Cir. 1984) (internal quotation omitted); *see also Windham v. Markle*, 163 F.3d 1092, 1106

20  (9th Cir. 1998). Nevertheless, because a criminal defendant is still entitled to adequate

21  instructions on the defense theory of the case, failure to instruct on a lesser included offense

22  could implicate a federal constitutional right where the instruction fits the defense theory of the

23  case. *See Bashor*, 730 F.2d at 1240; *Solis*, 219 F.3d at 928-29. The defense theory in question

24  must be supported by the law and have some foundation in the evidence. *Conde v. Henry*, 198

25  F.3d 734, 739 (9th Cir. 1999).

26  /////

1    Finally, in order to be entitled to relief, petitioner must show that any instructional

2 error had a "substantial and injurious effect or influence in determining the jury's verdict."

3 *Brecht*, 507 U.S. at 637; *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998); *see also Bains v.*

4 *Cambra*, 204 F.3d 964, 971 n. 2 (9th Cir. 2000) (habeas relief is unwarranted unless "it is

5 reasonably probable that a result more favorable to the appealing party would have been reached

6 in the absence of the [state court] error") (internal quotation omitted).

7    In this case, the challenged instruction did not render petitioner's trial

8 fundamentally unfair.  Even assuming that the trial evidence supported a defense theory of

9 involuntary manslaughter, the challenged instruction was not inaccurate.  At worst, it was only

10 potentially confusing to the extent it highlighted two particular sets of circumstances under which

11 a killing qualified as "unlawful" for purposes of involuntary manslaughter but did not identify

12 certain others, such as a killing committed in the course of a felony under circumstances where

13 petitioner had no malice aforethought, no intent to kill, and displayed no conscious disregard for

14 human life.

15    As the state appellate court noted, however, nothing in the court's instructions

16 suggested or implied that there were no other methods to prove that a killing was unlawful for

17 purposes of the definition of involuntary manslaughter.  Elsewhere, in both the murder and

18 voluntary manslaughter instructions, the jury was given the definition of an "unlawful killing":

19 "[a] killing is unlawful if it is neither justifiable nor excusable."  (RT at 854; 857.)  The voluntary

20 manslaughter instruction in particular was given just prior to the involuntary manslaughter

21 instruction of which petitioner complains.  These two manslaughter instructions were given one

22 after the other, just after the court's initial manslaughter instruction that "manslaughter is the

23 unlawful killing of a human being without malice aforethought.  It is not divided into degrees but

24 is of two kinds, namely, voluntary manslaughter and involuntary manslaughter."  (RT at 857.)

25 Under these circumstances, it is not likely that the jury misunderstood the word "unlawful" in the

26 involuntary manslaughter instruction to be different or less inclusive than the same word as it

16

1    was just defined and used in the previous and accompanying voluntary manslaughter instruction.

2            In sum, the state court's conclusion that the given instruction encompassed a

3    defense theory that petitioner unintentionally killed Wells under the circumstances required for a

4    conviction of involuntary manslaughter is not contrary to, or an unreasonable application of

5    applicable clearly established federal law.  Moreover, the alleged error did not have a substantial

6    or injurious effect or influence in determining the jury's verdict.  Ultimately the jury found

7    petitioner guilty of second degree murder.  This verdict reflects the jury's conclusion that

8    petitioner killed Wells with either express or implied malice aforethought *and* intent to kill.

9    Each of these findings precludes an alternative verdict that the killing was involuntary

10   manslaughter.  Based on the overall evidence at trial, it is not reasonably probable that, but for

11   the alleged deficiency in the court's involuntary manslaughter instruction, the jury would have

12   found that, in killing Wells, petitioner had no malice aforethought, no intent to kill, *and* that he

13   did not act with conscious disregard for human life.  Under these circumstances, petitioner fails

14   to demonstrate actual prejudice and his claim of instructional error fails.

15                   C.      Prosecutorial Misconduct

16           Petitioner claims three instances of misconduct by the prosecutor during closing

17   argument deprived him of his constitutional right to a fair trial.  Specifically, petitioner contends

18   that the prosecutor (1) misstated the law on involuntary manslaughter; (2) misstated the law on

19   voluntary manslaughter, and (3) improperly argued to the jurors that they needed to be able to

20   articulate an "important" reason for finding reasonable doubt.

21           Respondent asserts as an affirmative defense that petitioner's claim is

22   procedurally barred in this court because he forfeited his right to present the claims on direct

23   appeal in state court by failing to make a contemporaneous objection at trial.  As a general rule, a

24   federal habeas court "'will not review a question of federal law decided by a state court if the

25   decision of that court rests on a state law ground that is independent of the federal question and

26   adequate to support the judgment.'"  *Calderon v. United States District Court (Bean)*, 96 F.3d

1   1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

2         Respondent bears the ultimate burden of proving that state procedural default bars

3   federal review. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).  In order to bar federal

4   habeas corpus review, the state procedural rule must have also been actually relied on, clearly

5   and expressly, in the state court order in question.  *Coleman*, 501 U.S. at 735.  "[A] procedural

6   default based on an ambiguous order that does not clearly rest on independent and adequate state

7   grounds is not sufficient to preclude federal collateral review." *Valerio v. Crawford*, 306 F.3d

8   742, 774 (9th Cir. 2002) (quoting *Morales v. Calderon*, 85 F.3d 1387, 1392 (9th Cir. 1996).  For

9   example, if a state court order cites two different rules and fails to specify which rule applies to

10  which claims, that order is not sufficiently clear to bar federal habeas corpus review.  *See*

11  *generally Coleman*, 501 U.S. at 735; *see also Valerio*, 306 F.3d at 774-75.

12        In this case, the state appellate court held:

13        Defendant's failure to object has forfeited most of his
14        [prosecutorial misconduct] contentions on appeal, but given
          defendant's alternate ineffective assistance of counsel claims, we
          consider the merits of defendant's claims.

15

16  (*People v. Lee*, 2007 WL 2358709 at 20.)  The state court went on to address the merits of

17  petitioner's prosecutorial misconduct allegations, applying its conclusion to reach the merits of

18  petitioner's related ineffective assistance of counsel claims.  Because the state appellate court's

19  order is somewhat ambiguous with respect to whether it actually rejected petitioner's

20  prosecutorial misconduct allegations on the basis of procedural default or on the merits, the

21  merits of the allegations will be considered here.  *See Lambrix v. Singletary*, 520 U.S. 518, 525

22  (1997) ("When a federal habeas corpus petition presents both a question of procedural default

23  and a merits issue, the procedural bar question should ordinarily be considered first.  Where the

24  procedural issue presents complicated issues of law, however, and the merits question is easily

25  resolvable against the petitioner, judicial economy counsels giving the merits question priority.").

26  /////

The law applicable to each of petitioner's contentions of prosecutorial misconduct is the same.  On habeas corpus review, the narrow standard of due process applies.  *Darden v. Wainwright*, 477, U.S. 168, 181 (1986).  A prosecutor's error or misconduct does not, per se, violate a petitioner's constitutional rights.  *See Jeffries v. Blodgett,* 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181 and *Campbell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A criminal defendant's due process rights are violated only if the error or misconduct renders the trial fundamentally unfair.  *Darden*, 477 U.S. at 181.

The question to be resolved is "whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  In order to determine whether prosecutorial misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's remarks in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).  Relief is limited to cases in which the petitioner can establish that the misconduct resulted in actual prejudice.  *Johnson v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38).  Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

1. Prosecutor's Argument on Involuntary Manslaughter

During closing arguments, the prosecutor displayed a chart of various concepts related to the law of murder, and argued:

> For involuntary manslaughter... you have to have an unlawful killing.  And the unlawful killing has to have occurred in the course of an act -- which is an unlawful act, *but not a felony -- an unlawful act which is a felony, then you're not in this realm.*

(RT at 725-26.)  Later in argument, the prosecutor continued:

> [F]or it to be involuntary manslaughter, you have to have no malice aforethought, no intent to kill, no conscious disregard for human life.  You have to have none of those things.

19

I'll point out in a minute why we have [none of] those things.

*But in addition for it to be involuntary manslaughter, we have to have either a lawful act then with high risk, or a lawful act that has a high risk of danger done without due caution and circumspection.*

Now, if Mr. Lee is the one who, over drugs, over money, over sex, over cell phone, over whatever, is pulling out a knife and going after Crystal [ ] with a knife, that is not a lawful act. So we can forget about the due caution and circumspection because that is flat out not a lawful act.

Okay. So that one possible alternative for involuntary manslaughter is not there.

*So the other thing, an unlawful act not amounting to a felony, in other words, some misdemeanor was committed* which was dangerous to human life in the circumstances in which it was done in this case, he did that without these other things, and that would be another way of getting to involuntary manslaughter.

Now the trouble with this is that the unlawful act that he engages in is not a misdemeanor. If all he did was take out the knife and display it or exhibit it, okay, you know, that would be something which is sometimes called exhibiting a deadly weapon or brandishing a deadly weapon, and that is a misdemeanor. And that might be okay.

But he did more than that, because he went after her with the knife. She sustained three wounds. That's not just displaying or exhibiting a deadly weapon in a rude manner. That's assault with a deadly weapon. That's a felony.

*Since it's a felony, it doesn't check this box.* And so we also have some of these things up here, because we have either the conscious disregard for human life or the intent to kill, which will also take it out of the involuntary manslaughter.

*But on the basis of these two alone*, and certainly with these, it's not an involuntary manslaughter. *You can't check that box.*"

(RT at 775-666 (italics added).)

On direct appeal, the California Court of Appeal, Third District, agreed with petitioner that the italicized portion of the prosecutor's argument misstated the law, but ultimately rejected his prosecutorial misconduct claim on this basis:

/////

20

[T]he prosecutor's argument erroneously limited the methods of involuntary manslaughter to the two forms listed in the latter portion of CALJIC No. 8.45.  In fact, involuntary manslaughter is an unintentional homicide that may occur during the commission of (1) an unlawful act, not amounting to a felony; (2) in the commission of a lawful act which might produce death, in an unlawful manner, or "without due caution and circumspection" (§ 192, subd. (b)); (3) in the commission of a noninherently dangerous felony if that felony is committed without due caution and circumspection (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89); or (4) in the commission of an inherently dangerous felony, as long as malice and intent to kill are absent (*Cameron, supra,* 30 Cal.App.4th at pp. 603-605).

However, we note several points.

First, in his argument specifically addressing defendant's commission of assault with a deadly weapon, the prosecutor stated immediately after his comment "Since it's a felony, it doesn't check this box" that "we also have some of these things up here, because we have either the conscious disregard for human life or the intent to kill, which will also take it out of the involuntary manslaughter." The prosecutor's latter argument was a correct statement of the law explaining why if defendant killed Wells during the commission of an assault with a deadly weapon-the killing was not involuntary manslaughter. Indeed, a short time earlier in his argument, the prosecutor clearly stated the reason the crime was not involuntary manslaughter "because for involuntary manslaughter, you have to have no malice aforethought, no intent to kill, no conscious disregard for human life." Thus, we have both incorrect and correct statements regarding defendant's commission of a felony assault with a deadly weapon.

Second, at the beginning of his argument, the prosecutor told the jury he was using charts in his closing arguments to help explain how different legal concepts related to the law of murder. The prosecutor specifically told the jury his charts did not include all the language that was in the jury instructions. Apparently anticipating there might be some differences between his argument and the trial court's instructions, the prosecutor stated he was not trying to mislead the jury and expressly told the jury it was bound to follow "what His Honor tells you."

Third, the trial court gave the jury the following instruction both at the beginning of the trial and in its instructions after the parties had finished closing arguments: "If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." (CALJIC No. 1.00.)

21

1       The court's instructions are determinative in their statement of law,
2   and we presume the jury treated the court's instructions as
    statements of law, and the prosecutor's comments as words spoken
    by an advocate in an attempt to persuade." (*People v. Sanchez*
3   (1995) 12 Cal.4th 1, 70; accord *Boyde v. California* (1990) 494
    U.S. 370, 384-385 [108 L.Ed.2d 316, 331-332].) "This is not to say
4   that prosecutorial misrepresentations may never have a decisive
    effect on the jury, but only that they are not to be judged as having
5   the same force as an instruction from the court." (*Boyde v..
    California*, *supra*, at pp. 384-385 [108 L.Ed.2d at pp. 331-332].)
6   Here the prosecutor's misstatement of the law was tempered both
    by the prosecutor's own admonition to the jury that it must follow
7   the trial court's instructions, not his argument, and the trial court's
    direction to the same effect. The trial court denied the jury's
8   request to have the arguments read back to them, so the
    prosecutor's argument was not emphasized by repetition.
9   Considering the whole record, we do not view the prosecutorial
    misstatements as likely to have changed the jury's understanding of
10  the involuntary manslaughter instructions given.

11  (*People v. Lee*, 2007 WL 2358709 at 17-18.)

12      The state appellate court's rejection of petitioner's claim in this regard is not

13  contrary to, or an unreasonable application of clearly established federal law applicable to the

14  issue.  For the reasons set forth by the state appellate court, the prosecutor's error did not render

15  petitioner's trial fundamentally unfair in violation of due process.  Moreover, petitioner fails to

16  demonstrate prejudice.  The prosecutor's error did not have substantial or injurious effect or

17  influence in determining the jury's verdict.  As the prosecutor noted, a verdict that petitioner was

18  guilty of involuntary manslaughter could only be returned if the jury found no malice

19  aforethought, no intent to kill, and no conscious disregard for human life.  As previously noted in

20  subsection B, the jury returned a verdict of second degree murder, finding specifically that

21  petitioner had malice aforethought and intent to kill.  Under the circumstances of this case, there

22  is no reasonable probability that the outcome at trial would have been different, but for the

23  prosecutor's misstatement of the law on voluntary manslaughter during closing arguments.

24          2.  Prosecutor's Argument on Voluntary Manslaughter

25      Petitioner also contends that the prosecutor misstated the law on voluntary

26  manslaughter.  In closing argument, the prosecutor pointed out that in order for the killing to be

voluntary manslaughter as opposed to murder, the law required that petitioner had either actual

but unreasonable belief in the need to defend himself, or that the provocation by Wells was

objectively adequate, that is, it would have caused an ordinary person of average disposition to

act rashly.  With respect to the latter possibility, petitioner contends that the prosecutor

improperly argued that the provocation would have had to be sufficient to cause an ordinary

reasonable person to act *as petitioner acted*.  The prosecutor argued:

> [H]e never believed that he had to defend himself against Crystal Wells pulling out the knife, because she didn't pull out the knife.  That's part of the big lie.  She didn't pull out the knife.

> He had no actual belief that he needed to defend himself; and therefore, this is not a case of imperfect self-defense, nor is it a case of heat of passion such as will mitigate the ordinary elements of malice down to manslaughter.

> Remember, sudden quarrel or heat of passion, passion as would be aroused in the mind of an ordinary reasonable person, such that an ordinary reasonable person of average disposition, it says or -- it's another typographical error -- ordinary reasonable person of average disposition would act rashly without deliberation and reflection.  In doing what?  In pulling out the knife and engaging in that conduct.  Okay.

> Now, here's where you get to use your common sense.  Okay.  In your sense of what is the ordinary everyday person -- is the language -- of average disposition.  Okay.  The twelve of you get together, and you represent the community in sort of coming up with a sense of what is an ordinary reasonable person of average disposition.

> I ask you, ladies and gentlemen, what ordinary average person, you know of, you know, reasonable and average disposition would decide that on the basis of twenty-seven dollars, or a cell phone which is sitting right out in plain view, or sex that was or was not agreed to or provided, or a sixteenth of crank, of meth, what ordinary reasonable person is going to decide that that's worth pulling out a knife over?

> That is not the reaction of an ordinary reasonable person of average disposition.  So we don't have that kind of element which would mitigate it down to voluntary manslaughter, so that means that what we have here, ladies and gentlemen, is a murder, because we have evidence of intent to kill, and we have evidence of conscious disregard for human life.

1   (RT at 777-78.)

2          On direct appeal, the state appellate court rejected petitioner's prosecutorial

3   misconduct claim based on this allegation.  The state court held:

4          There was no misconduct. The prosecution's comments did no
           more than direct the jury's attention to the issue of whether the
5          claimed provocation was objectively adequate, that is, "it would
           cause an ordinary person of average disposition to act rashly...."
6          (*People v. Lee, supra,* 20 Cal.4th at p. 59; accord *People v. Barton,
           supra,* 12 Cal.4th at p. 201.) The argument was properly focused
7          on the objective component of heat of passion. (*People v. Lee,
           supra,* at p. 60 [test of adequate provocation is an objective one].)

8

9   (*People v. Lee*, 2007 WL 2358709 at 17-18.)  This decision is not contrary to, or an unreasonable

10  application of clearly established federal law.  The prosecutor's argument did not render

11  petitioner's trial fundamentally unfair in violation of due process.  Petitioner does not dispute

12  that the jury was properly instructed on the law of voluntary manslaughter.  Nothing in the record

13  indicates that the jury failed to follow the court's instructions or that the jury discarded the

14  instructions in favor of the prosecutor's argument.  Viewing the prosecutor's argument in the

15  context of the given jury instructions and the entire trial, there was no due process violation.

16  Petitioner also fails to demonstrate prejudice under these circumstances.

17                     3.  Prosecutor's Argument on Reasonable Doubt

18         Petitioner also contends that the prosecutor's argument misstated the law on

19  reasonable doubt.  Near the end of his rebuttal, the prosecutor argued:

20         [U]se the standard of proof beyond a reasonable doubt.  Proof
           beyond a reasonable doubt is the standard here.  And I submit to
21         you in terms of analyzing proof beyond a reasonable doubt, it's not
           something His Honor will instruct you.  But as a matter of analysis,
22         I submit that you ought to really do it as kind of a two-step process.
           Number one, do I have a doubt?  You know, do I have a doubt?  So
23         that's the first thing is, do I have a doubt?

24         And then once you've decided that, okay, do I have a doubt?  You
           know, what's it about?  Is it an important thing or an unimportant
25         thing?  But do I have a doubt about something that makes a
           difference?  Okay.

26

1       Now that I've identified the doubt, is it a reasonable doubt?  If you
don't have a doubt, it cannot be a reasonable doubt.  But if you

2       have a doubt, it still has to be a reasonable doubt.

3 (RT at 826-27.)  The defense objected, and the following exchange occurred:

4       [Defense counsel]: Your Honor, I object, that's not the standard,
people versus Hill.

5

6       THE COURT: Let me have it read back, please.

7       (The reporter read the record as requested.)

8       THE COURT: I'm not sure.  What's the defect in that?

9       [Defense counsel]: The instruction is what it says, it's beyond a
reasonable doubt, an abiding conviction of the truth of the charge.

10     THE COURT: That's correct.

11     [Defense counsel]: It's not just any -- it's a mischaracterization.

12     THE COURT: All right.  Ladies and gentlemen, just let me say
this.  This is a very, very touchy area of the law.  And the law says

13     that even a judge has to be very careful about how he goes to
explain about what reasonable doubt is, okay, because when you

14     try to use analogies or examples as a judge, you can get in trouble.

15     And the same thing can happen to the attorneys when they are
starting to try and explain what reasonable doubt is.

16

17     I cannot say that Mr. Locher has said anything wrong.  I mean, it
seems to me what he's saying is that you can have a doubt -- you

18     can have lots of doubts, but they have to be about things that are
important or relevant to the issues.  And I don't take exception to
that.

19

20     But the bottom line is you have to pay attention to, as Mr. Warden
points out, how reasonable doubt is defined in the instructions,

21     which you'll be given a copy of.  It's 2.90, and that's the definition
that you go by.  Okay.  It's very important.

22     So -- and I think that's sort of what you're saying is that he's
getting away from the definition.

23

24     [Defense counsel]: Fair enough.

25     THE COURT: Go ahead, [prosecutor].

26     [Prosecutor]: But I've said no more than what the instruction said,
and that is, that it has to be a reasonable doubt.  The instruction

says, "A reasonable doubt is not a mere possible doubt," and then it
goes on to give a further explanation. "It is that state of the case
which, after the entire comparison and consideration of all the
evidence, leaves the minds of the jurors in the condition that they
cannot say they feel an abiding conviction of the truth of the
charge."

...

The only point I'm making, the point that I did make is that you
have to have a doubt, and then that doubt has to be a reasonable
doubt. It has to be a reasonable doubt as defined here.

(RT at 827-29.)

Petitioner contends that the prosecutor's argument incorrectly represented that the

jurors had to have reasonable doubt about "something important," as opposed to just reasonable

doubt, and essentially shifted the burden of proof to the defense to provide reasons for doubt.

On direct appeal, the state appellate court held:

We agree with the trial court that the prosecutor's comments did
not argue any doubt must be supported "by evidence" so as to
suggest defendant had the burden of demonstrating reasonable
doubt, as was the case in *Hill*. Nor did the analysis recommended
by the prosecutor tell the jury it must, as defendant argues,
"articulate a justification for each and every doubt they might
have." The argument merely told the jurors they should evaluate
the significance of any particular doubt they have. The use of the
term "important" was not likely to be understood by the jury as
raising the level of doubt needed for acquittal. Rather, the
argument and the trial court's comments were directed at the
portion of the instruction regarding reasonable doubt that informs
the jury reasonable doubt "is not a mere possible doubt; because
everything relating to human affairs is open to a mere possible or
imaginary doubt." (CALJIC No. 2.90.) To be reasonable doubt,
the doubt must be relevant to an issue; it must, as the prosecutor
stated, "make [ ] a difference." There was no misconduct.

(*People v. Lee*, 2007 WL 2358709 at 21.)

The Due Process Clause of the Fourteenth Amendment protects the accused

against conviction except upon proof beyond a reasonable doubt of every fact necessary to

constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970).

Here, there is no dispute that the jury was properly instructed on the reasonable doubt burden of

26

1    proof.  To any extent the prosecutor's argument may have misstated the reasonable doubt burden

2    of proof, it was corrected by the trial court's cautionary instruction and the prosecutor's

3    subsequent clarification of his point.  It is presumed that the jury followed the court's instructions

4    on the reasonable doubt burden of proof.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).

5    This is not a case of *Winship* error in which the prosecution's burden was lowered below the

6    reasonable doubt standard.  Petitioner also fails to demonstrate that the prosecutor's argument

7    caused actual prejudice.  Petitioner is not entitled to relief for his claim of prosecutorial

8    misconduct.

9                    D.       Court's Response to Jury Questions about Heat of Passion

10                   Petitioner claims the trial court violated his right to due process and a fair trial by

11   giving erroneous and incomplete responses to questions from the jury about voluntary

12   manslaughter and "heat of passion."

13                   Before deliberations began, the jury was instructed with CALJIC No. 8.44 as

14   follows:

15                   Neither fear, revenge, nor the emotion induced by and
                     accompanying or following an intent to commit a felony, nor any
16                   or all of these emotional states, in and of themselves, constitute the
                     heat of passion referred to in the law of manslaughter.  Any or all
17                   of these emotions may be involved in a heat of passion that causes
                     judgement to give way to impulse and rashness.  Also any one or
18                   more of them may exist in the mind of a person who acts
                     deliberately and from choice, where the choice is reasonable or
19                   unreasonable.

20   (RT at 860.)

21                   On the third day of deliberations, the jury asked Question No. 5: "Please clarify

22   section 8.44, especially the part dealing with felony and the feelings around it related to

23   manslaughter[.] If a felony is about to be committed or was committed, does that negate heat of

24   passion[?]" (CT at 196.)  The trial court responded:

25                   The fundamental inquiry in this area of the law of homicide, is
                     whether or not the defendant's reason was, at the time of his act, so
26                   disturbed or obscured by some passion - not necessarily fear or

27

1   revenge - to such an extent as would render an ordinary person of
2   average disposition liable to act rashly or without due deliberation
    and reflection, and from this passion rather tha[n] from judgment.

3   There is no specific type of provocation required by section 192 of
    the Penal Code, (Voluntary Manslaughter) and verbal provocation
4   may be sufficient depending on the circumstances of the individual
    case.  'Passion' need not mean 'rage' or 'anger' but may be any
5   violent, intense, high wrought or enthusiastic emotion.

6   (CT at 198.)

7           Some time later, the jury asked Question No. 8, requesting the definition of "heat

8   of passion."  (CT at 200.)  The trial court responded:

9           Please be advised that this subject is addressed in your jury
            instructions, to wit: 8.40 which is voluntary manslaughter defined;
10          8.42 which is sudden quarrel or heat of passion and provocation
            explained; 8.43 explanation of whether or not sufficient time has
11          elapsed for heat of passion to end i.e. the so called 'cooling
            period'; 8.44 the law explaining that no specific emotion alone
12          constitutes heat of passion.

13          These instructions can be found on pages 11 and 12 of your jury instructions.

14          Further, the court has attempted to expand on the above legal
            concepts in the court[']s previous response to your questions '5 and
15          6' wherein you asked for clarification of instruction 8.44
            'especially the part dealing with felony and the feelings around it
16          related to manslaughter.

17          Additionally, 'heat of passion' arises from some provocation. The
            provocation must be legally sufficient, that is, it must be the sort of
18          provocation that would cause an ordinary, reasonable person to
            respond in heat of passion. 'Heat of passion' can arise from any
19          provocation that would arouse great anger, fear, jealousy, or other
            intense emotion. If the provocation is so slight that it would not
20          arouse such an intense emotion in an ordinary, reasonable person,
            it is not legally sufficient."

21

22  (CT at 201.)

23          Petitioner complains that "[t]he trial court's response [to Question 5] stated that

24  'the fundamental inquiry' was whether the defendant's reason was obscured by heat of passion."

25  "In fact," petitioner alleges, "the 'fundamental inquiry' was whether the state had disproved this

26  fact beyond a reasonable doubt."  Therefore, petitioner asserts, the trial court's responses to

                                          28

1    Questions 5 and 8 were misleading and "unbalanced" because the court failed to remind jurors of

2    "the essential principle that the prosecution had the burden of proving beyond a reasonable doubt

3    that heat of passion was not established."

4              On direct appeal, the state appellate court rejected petitioner's claim of error,

5    holding:

6              The trial court instructed with CALJIC No. 8.50 regarding the
              prosecution's burden of proof regarding the absence of heat of
7              passion.  Nothing in the jury's subsequent questions suggested any
              confusion as to that burden or need for re-instruction regarding that
8              burden.  The trial court fulfilled its duty under section 1138 by
              addressing the issues identified by the jury.

9

10   (*People v. Lee*, 2007 WL 2358709 at 15.)

11             "When a jury makes explicit its difficulties a trial judge should clear them away

12   with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also*

13   *Weeks v. Angelone*, 528 U.S. 225 (2000).  In *Weeks*, the Supreme Court "noted that the original

14   instruction was correct and that the judge directed the jury to the precise paragraph that answered

15   the question clearly.  This was sufficient to pass constitutional muster..." *Beardslee v. Woodford*,

16   358 F.3d 560, 574-75 (9th Cir. 2004) (citing *Weeks*, 528 U.S. at 234).  *Cf. Beardslee v.*

17   *Woodford*, 358 F.3d at 575 (harmless due process violation occurred when, in responding to

18   jury's request for clarification, court refused to give clarification and informed that no clarifying

19   instruction would be given).  A jury is presumed to understand a judge's answer to a question.

20   *Weeks*, 528 U.S. at 234; *but see United States v. Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999)

21   (trial judge's confusing response to jury's questions raised possibility that verdict was based on

22   conduct legally inadequate to support conviction).

23             In this case, petitioner merely speculates that the jury somehow failed to grasp or

24   had forgotten that the prosecution has the burden to establish the absence of heat of passion.  Yet,

25   as the state court pointed out, the jury was properly instructed that "[t]o establish that a killing is

26   murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt...

[the absence of] heat of passion..." (RT at 863.)  This instruction was provided, along with all

others, to the jury in written form.  The trial court's response to the jury's question was neither

confusing nor inaccurate.  Under these circumstances, it is presumed that the jury understood the

response, and did not mistakenly believe it reduced or negated the prosecution's burden of proof

as it had been set forth in another instruction already given.  *See Weeks*, 528 U.S. at 234.

Petitioner's speculative theory that the jury did not understand the prosecution's burden of proof

will not suffice for habeas corpus relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)

(conclusory allegations lacking in factual support do not provide a sufficient basis for habeas

corpus relief).

E.      Ineffective Assistance of Counsel

Petitioner contends that trial counsel rendered ineffective assistance of counsel in

the following ways: (1) failing to request three jury instructions on self-defense; (2) failing to

object to the court's responses to jury questions about heat of passion; and (3) failing to object to

the prosecutor's misstatements of the law with respect to involuntary manslaughter."[2]  On direct

appeal, the state appellate court held, with respect to this claim:

> We have considered each claim as we considered the underlying
> merits of defendant's arguments. Where necessary we have
> explained why we reject defendant's claim of ineffective assistance
> of counsel. Where we have found error, we found no prejudice.
> Thus, we necessarily reject defendant's claim of ineffective
> assistance of counsel. (*People v. Ochoa, supra,* 19 Cal.4th 353,
> 414; *Strickland v. Washington, supra,* 466 U.S. 668 [80 L.Ed.2d
> 674].)

(*People v. Lee*, 2007 WL 2358709 at 15.)

/////

---

[2] In his reply brief, petitioner argues that counsel also rendered ineffective assistance in
failing to object to the trial court's involuntary manslaughter instruction (*see* subsection B,
*supra*), in failing to object to the trial court's instruction on assault with a deadly weapon, and in
failing to object to the prosecutor's argument that reasonable doubt must be about "something
important" (*see* subsection C(3), *supra*).  Since petitioner made these allegations for the first time
in his reply brief, they need not be addressed here.  *See In re Rains*, 428 F.3d at 902.

1    The Sixth Amendment guarantees a criminal defendant the effective assistance of

2 counsel.  A showing of ineffective assistance of counsel has two components.  First, a petitioner

3 must show that, considering all the circumstances, counsel's performance fell below an objective

4 standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  In

5 assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that

6 counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v.*

7 *Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel

8 "exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*,

9 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

10    The second factor required for a showing of ineffective assistance of counsel is

11 actual prejudice caused by the deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice

12 is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

13 result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a

14 probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Williams*, 529 U.S.

15 at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

16    1.  Counsel's Alleged Failure to Request Appropriate Instructions

17    Petitioner alleges that counsel failed to request three appropriate jury instructions

18 on self-defense.  Each allegation will be separately set forth and discussed.

19    a.  Instruction on reasonable force to recover stolen property

20    First, petitioner contends counsel should have requested an instruction that "a

21 person may use reasonable force to recover stolen property."  On direct appeal, however, the state

22 appellate court held:

23    [W]ith one exception, the authorities cited by defendant concern a
      person's right to "protect" or "defend" their property. Specifically,
24    article I, section 1 of the California Constitution states all people
      have inalienable rights including, among others, "enjoying and
25    *defending* life and liberty, acquiring, possessing, and *protecting*
      property[.]" (Italics added.) In *Kentucky Fried Chicken of Cal., Inc.*
26    *v. Superior Court* (1997) 14 Cal.4th 814, the California Supreme

31

1  Court held "only that there is no duty to comply with a robber's unlawful demand for the surrender of property." (*Id.* at p. 829.)
2  *Fawkes v. Reynolds* (1922) 190 Cal. 204, involved the right of a person to use reasonable force to defend himself and his property
3  against a physical attack. (*Id.* at pp. 212-213.)

4  The only authority cited by defendant that does not involve the protection or defense of property is *People v. Tufunga* (1999) 21
5  Cal.4th 935. In that case, the California Supreme Court held that a claim of right (good faith belief in right or claim to specific
6  personal property) is still recognized as a defense to a criminal charge of robbery because it negates the necessary felonious intent
7  required under section 211. (*Id.* at pp. 943, 945-950.) In recognizing the Legislature's continuance of the claim-of-right
8  defense to criminal liability for robbery, however, the Supreme Court certainly did not approve the forcible recovery of stolen
9  property. (See *id.* at pp. 938-939, 950-956.)

10  Indeed, none of the authorities cited by defendant provide a person with a privilege to use force to "retrieve" already stolen property.
11  Such a principle would in fact be at odds with the general rule "'that one who is or believes he is injured or deprived of what he is
12  lawfully entitled to must apply to the state for help. Self-help is in conflict with the very idea of the social order. It subjects the
13  weaker to risk of the arbitrary will or mistaken belief of the stronger. Hence the law in general forbids it.'" (*Daluiso v. Boone*
14  (1969) 71 Cal.2d 484, 500.)

15  (*People v. Lee*, 2007 WL 2358709 at 9.)

16  The state court's conclusion that such an instruction was improper, and not

17  available under state law, is binding on this court. *See Bradshaw*, 546 U.S. at 76 ("state court's

18  interpretation of state law, including one announced on direct appeal of the challenged

19  conviction, binds a federal court sitting in habeas corpus").  Accordingly, petitioner fails to

20  demonstrate that counsel's failure to request the instruction was deficient, or that prejudice

21  ensued.

22  b.  Instruction on robbery as a forcible and atrocious crime

23  Petitioner next contends counsel should have requested an instruction "that

24  petitioner was not guilty if he killed Ms. Wells while resisting a robbery [a forcible and atrocious

25  crime]."

26  /////

32

1    At trial, the jury was instructed:

2    Homicide is justifiable and not unlawful when committed in the
     defense of himself if he actually and reasonably believed that the
3    individual killed intended to commit *a forcible and atrocious
     crime*, and there was imminent danger of that crime being
4    accomplished...

5    ...

6    A forcible and atrocious crime is any felony that by its nature and
     the manner of its commission threatens, or is reasonably believed
7    by the defendant to threaten life or great bodily injury so as to
     instill in him a reasonable fear of death or great bodily injury.

8    Murder is a forcible and atrocious crime.

9

10   (RT at 851-52.)

11          On direct appeal, considering the issue whether the trial court had a duty to give

12   an instruction that robbery is a forcible and atrocious crime, *sua sponte*, the state appellate court

13   held:

14   While a robbery may be a forcible and atrocious crime as a matter
     of law in certain cases (see *People v. Ceballos* (1974) 12 Cal.3d
15   470, 478), such is not the case here. According to defendant's
     testimony, Wells stole defendant's drugs, money, and/or cell phone
16   without any use of force or fear and, under defendant's version of
     events, only later used the knife to scare defendant into leaving and
17   in response to defendant's attempt to get his property back. While
     these facts may be sufficient to establish a robbery by Wells (see
18   *People v. Cooper* (1991) 53 Cal.3d 1158, 1165), it was up to the
     jury to decide whether the "nature and the manner of [the
19   robbery's] commission threaten[ed], or [wa]s reasonably believed
     by the defendant to threaten life or great bodily injury so as to
20   instill in him a reasonable fear of death or great bodily injury."
     (CALJIC No. 5.16.) The jury was properly so instructed under the
21   general definition of a forcible and atrocious crime.

22   (*People v. Lee*, 2007 WL 2358709 at 10-11.)  Thus, the state court determined on direct appeal

23   that the instruction was improper and not available on state law grounds.  Again, such a

24   determination is binding on federal habeas corpus.  *See Bradshaw*, 546 U.S. at 76.  Under these

25   circumstances, petitioner fails to demonstrate deficient performance on the part of counsel, or

26   that he suffered prejudice.

33

c.  Instruction on self-defense by an aggressor

Finally, petitioner alleges that counsel should have requested an instruction "that even if jurors found that petitioner's initial use of force was unjustified, he was permitted to act in self-defense if Ms. Wells countered a simple assault with deadly force."

At the time of petitioner's trial, the second paragraph of CALJIC No. 5.54 (2004 Re-revision) provided as follows: "If the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense."

On direct appeal, the state court held with respect to this claim:

> [Counsel's] failure to make such request was not ineffective assistance of counsel... [¶] Here defense counsel reasonably may have tactically chosen not to request an instruction that was premised on defendant being the original aggressor, a label and focus which counsel may have wanted to avoid.

(*People v. Lee*, 2007 WL 2358709 at 10-11.)

In light of the strong presumption afforded to counsel that all tactical decisions were reasonable, the state court's finding of no deficient performance and reasoning therefore is not contrary to, or an unreasonable application of the applicable *Strickland* standard.  Moreover, petitioner fails to demonstrate that he suffered actual prejudice from counsel's alleged failure. Considering all the evidence at trial, it is unlikely that the jury could have found that Wells responded to a simple assault by petitioner in "a sudden and deadly counterassault." Accordingly, there is no reasonable probability that, but for counsel's failure to request the instruction, the result of the proceeding would have been different.

2.      Counsel's Alleged Failure to Object to Inaccurate or Incomplete Responses to Jury Questions

Petitioner next contends that counsel failed to object to "the incomplete and erroneous instructions" given by the trial court in response to the jury's Questions Nos. 5 and 8 about "heat of passion."  Petitioner asserts specifically that counsel should have requested "that

1  jurors be reminded along with the other relevant instructions given that the prosecution had the
2  burden of proving beyond a reasonable doubt that the offense was not committed in the heat of
3  passion."

4         It has already been determined that the trial court's response was not
5  constitutionally deficient for this alleged omission.  (*See* subsection D, *supra*.)  As discussed, the
6  jury was properly instructed that the prosecution had the burden to prove absence of heat of
7  passion.  There is no indication that the jury misunderstood either of the court's responses to
8  negate this instruction.  By this same reasoning, counsel was not deficient for allegedly failing to
9  request re-instruction on this point, and petitioner did not suffer prejudice.

10
11                 3.     Counsel's Alleged Failure to Object to the Prosecutor's Argument

12         Finally, petitioner contends that counsel's performance was deficient in failing to
13  object to the portion of the prosecutor's argument that "permitted jurors to reject the possibility
14  of convicting [upon] a lesser included offense [involuntary manslaughter] on legally erroneous
15  grounds."

16         Indeed, the prosecutor misstated the law on involuntary manslaughter during
17  closing arguments.  (*See* subsection C, *supra*.)  Since there was no tactical reason for counsel's
18  failure to object, it appears that counsel's performance was deficient in this regard.  Nevertheless,
19  petitioner is not entitled to relief because he fails to demonstrate that the omission was
20  prejudicial.  For the same reasons it was already concluded that the prosecutor's error did not
21  cause actual prejudice, counsel's failure to object likewise did not have substantial or injurious
22  effect or influence in determining the jury's verdict.

23           F.    Cumulative Error

24         Petitioner contends that the cumulative effect of the claimed errors deprived him
25  of his right to due process of law and a fair trial.

26  /////

The combined effect of multiple trial errors may give rise to a due process violation if the trial was rendered fundamentally unfair, even where each error considered individually would not require reversal.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th. Cir. 2007) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v. Mississippi*, 410 U.S. 284, 290 (1973)).  In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant.  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).  The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' *Chambers*, 410 U.S. at 294, thereby having a 'substantial and injurious effect or influence' on the jury's verdict.  *Parle*, 505 F.3d at 927 (*quoting Brecht*, 507 U.S. at 637).

Here, it was determined that the prosecutor misstated the law during closing argument, although prejudice did not ensue.  But petitioner suffered no other errors of constitutional magnitude.  Thus, there is no combined effect of errors to be reviewed.  *United States v. Geston*, 299 F.3d 1130, 1138 (9th Cir. 2002) ("Because there is only one error in this case, cumulative error analysis is not triggered."); *United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) (holding that "[o]ne error is not cumulative error").

## VI.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file

objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 9, 2010

*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

37